UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| BRIAN KEITH OUELLETTE, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Civil No. 05-139-B-W |
| | ) |
| MAINE STATE PRISON, et al., | ) |
| | ) |
| Defendants | ) |

*RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT*

Brian Ouellette has filed a 42 U.S.C. § 1983 complaint concerning his treatment as a protective custody inmate at the Maine State Prison. He points, in particular, to a lack of adequate education, treatment, rehabilitation, employment, and recreation opportunities. In his amended complaint Ouellette also refers to being subjected to mental stress and an unnecessary risk of both physical and verbal attacks when he is exposed to the general population. Further, he asserts that his due process rights were infringed apropos the defendants' response to his efforts to complain about these conditions. The defendants named in the amended complaint – Jeffery Merrill, Nelson Riley, Dwight Fowls, and Martin Magnusson – move for summary judgment on the grounds that Ouellette did not fully and properly grieve the concerns raised in his complaint through the prison's three-step grievance process and that the case should be dismissed pursuant to 42 U.S.C. § 1997e(a). (Docket No. 16.) I recommend that the Court deny the motion for summary judgment based on the facts and the reasons that follow.

## *Discussion*

"No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C.§ 1997e(a).

### *Defendants' Material Facts*

Ouellette was a prisoner in the custody of the Department of Corrections at the time of this lawsuit (SMF ¶ 1) and remains a prisoner in the Department's custody (id. ¶ 2). The grievance policy in effect at the time relevant to Ouellette's lawsuit, the alleged disparate treatment of protective custody prisoners from those in the general population with regard to living conditions, recreational activities, and educational opportunities, was Policy 29.1. (Id. ¶ 3.) Under the grievance policy, there is a formal grievance process that has three levels of review. (Id. ¶ 4.) If the prisoner is not satisfied with the response to his initial grievance, he may request a second level of review, which, under the policy, is review by the Chief Administrative Officer. (Id. ¶ 5.) There is no grievance appeal in the facility grievance file regarding the alleged disparate treatment of protective custody prisoners from those in the general population from the plaintiff that was forwarded for the Chief Administrative Officer's review. (Id. ¶ 6.) If the prisoner is not satisfied with the response to the second level of review, he may request a third level of review, which is a review by the Commissioner of Corrections and is the final administrative level of review. (Id. ¶ 7.) There is no grievance appeal in the facility grievance file regarding the alleged disparate treatment of protective custody prisoners from those in the general population from the plaintiff that was forwarded for the Commissioner's review. (Id. ¶ 8.)

### *Ouellette's Factual Responses*

In his statement of disputed material fact Ouellette claims that there is a genuine dispute as to whether or not he has exhausted his administrative remedies prior to filing suit. (Pl.'s SDMF ¶ 1.) In his declaration in opposition to the motion for summary judgment, Ouellette forwards, under penalty of perjury, some twenty paragraphs pertaining to his efforts to grieve his complaints about the treatment of prisoners in protective custody.

In this pleading Ouellette indicates that on July 25, 2005, he sent a letter to Governor Baldacci, Commissioner Magnusson, Warden Merrill, and Chief Inmate Advocate Wesley Andrenyak outlining his concerns vis-à-vis inmates in the protective custody unit. (Decl. ¶ 8 & Attach. F.) With respect to his efforts to comply with the prison's formal grievance procedure, Ouellette states that he filed a first-stage grievance on August 2, 2005. (Decl. ¶ 11.)

Captain Drake wrote Ouellette a response to his July 25, 2005, letter dated August 1, 2005. (Costigan Affs. Attach. B, Docket No. 20.)[1] On August 8, 2005, Ouellette received a response from Deputy Warden Riley which indicated that the July 25, 2005, letter had been referred to Riley's office for review and that Riley was satisfied that protective custody inmates were being treated properly and that they were being provided with privileges and opportunities that approximated those of the general population. (Decl. ¶ 13; Costigan Affs. Attach. C, Docket No. 20.)

On August 25, 2005, Ouellette, having still not received a response from the grievance review officer within the twenty-day period promised on his receipt for that grievance, sent a letter to Costigan, the grievance review officer, stating that the time-limit for a response from Costigan had elapsed, indicating that Ouellette was pursuing a legal action against the prison, and explaining that he expected a

---

[1] Ouellette does not include this letter in his factual declaration but inserting it here helps in understanding

3

response immediately.  (Id. ¶ 14 & Attach. E.)  By September 5, 2005, Ouellette had still not received a response to his grievance and so he filed this civil action. (Id. ¶ 15.)  On September 8, 2005, after thirty-five days had expired since he filed his grievance (and fourteen days after Ouellette's letter requesting a response) Ouellette received this Level I response from Costigan:

> I have completed the review of your grievance regarding confinement in the Protective Custody Unit.  You wrote to the Commissioner, Warden and others regarding these issues on July 25, 2005 and then submitted a grievance on August 2, 3005 before staff had an opportunity to respond to your concerns.  Deputy Warden Riley responded to your concerns in writing on August 8, 2005.  A copy of that letter has been place in the grievance file.  Separately, Captain Drake responded to your concerns directly in a memo dated August 1, 2005.  I am satisfied that Protective Custody prisoners are provided with privileges and opportunities that approximate those of general population, at least to the extent possible.   Access to the general population Recreation Area and Education Department is not possible at this time.  However, recreation and games are available in the general population.  Protective Custody prisoners do have access to educational opportunities including, substance abuse, anger management, stress management, GED and AA meetings.  Programs and Security staff are working to identify other education opportunities that may be provided to prisoners in the Protective Custody Unit.  Your grievance is denied.

(Decl. Attach. D.)

Ouellette argues that the defendants' "failure to comply with internal Policies and Procedures by the grievance review officer gave the plaintiff the right, and in fact left him little choice but to seek relief from the court."  (Decl. ¶ 17.)

In their response to Ouellette's defense of the summary judgment motion, the defendants argue:

> The plaintiff, Mr. Ouellette, failed to controvert the material facts submitted by the defendants.... Those facts demonstrate that Mr. Ouellette failed to exhaust his administrative remedies by failing to file a second or third level grievance on his initial grievance before filing his federal lawsuit with this Court.
> Prior to filing his level I civil rights grievance, Mr. Ouellette had first written a more detailed informal complaint to numerous people. Before any of the recipients had

---

the defendants' response to Ouellette's factual assertions.

>the chance to respond, he filed his level I grievance on August 2, 2005. However, before the twenty day time period for the grievance review officer to reply, Mr. Ouellette received responses from two other prison officials regarding his July 25, 2005 complaint- one from Unit Manager Captain Drake, on August 1, 2005, and another from the Deputy Warden Nelson Riley, on August 8, 2005, well within the time frame for the grievance response. Because grievance review officer Costigan received a copy of Drake's and Riley's responses, and because those responses addressed the very same issues contained in Mr. Ouellette's level I grievance, it was Mr. Costigan's assessment that those responses were sufficient responses to Mr. Ouellette's grievance. However, when Mr. Ouellette brought to Mr. Costigan's attention that he was waiting for a specific response from Mr. Costigan, Costigan did respond and made clear that he had been relying on the responses from Drake and Riley to address Mr. Ouellette's complaints.
>
>>Mr. Ouellette's remedy, if he was not satisfied with the letters from Drake and Riley, would have been to file a level two appeal when the twenty day time period had passed. There is nothing in the grievance policy or anywhere else that gives Ouellette the automatic "right," as he claims, to pass over the other two appeal levels in the grievance policy and fast-forward to the federal courts if the twenty day time period passes.

(Defs.' Reply Opp'n. Mot. Summ. J. at 1-2)(record citation omitted).

### *Recommended Disposition*

I am troubled by the defendants' insistence that Ouellette comply with the grievance procedure without any deviation, even though Ouellette subjectively believes that he had met a dead end. Their arguments permit the officers responsible for their end of the grievance procedure to vary from the policy based on a subjective view of where Ouellette stood in the grievance process. This is not the first time that such a lopsided treatment of the grievance responsibilities has been urged to the benefit of prison defendants and to the detriment of the inmate/plaintiff. The defendants seem to be arguing that Ouellette should have viewed Drake's and Riley's responses to his July 25, 2005, letter as the stage-one response to his properly filed August 2, 2005, grievance. Given the clear directive of the prison's grievance policy, it is not at all clear to me that Ouellette could have taken one or both of these

responses to his July 25, 2005, letter and submitted a stage-two appeal as these responses were clearly not in response to a properly filed grievance.[2]   Perhaps the defendants believe that the lack of response to his August 2, 2005, grievance within the twenty-day period should have been interpreted by Ouellette as a formal denial but I am skeptical that Ouellette would have got far with a level two grievance on such a theory. The record here evidences that Ouellette was aware of the need to exhaust his grievances prior to proceeding with this suit and pressed Costigan for a response to his August 2, 2005, submission. It is reasonable to infer that at the time that Ouellette filed this suit he thought that he had no further grievance avenues open to him at the Prison given the undisputed fact that he had received no formal response from Costigan to his August 2 grievance.[3]   Then came Costigan's formal response to his grievance which he could have appealed but Ouellette had already "brought" this action.

It is clear from this dispute (and other similar disputes that I have had before me) that the correctional defendants do not believe that they have to comply with all the timeframes set in the grievance policy in order to preserve a non-exhaustion argument and it may well be that placing such a burden on them would be unreasonable given the not necessarily predictable level of burden various investigations into different grievances places on prison personnel.  There is not much precedent that I

---

[2]   The problem is that once these disputes move to a 42 U.S.C. § 1983 action the defendants in hindsight can use any deviation by the prisoner to argue that he or she has not complied with 42 U.S.C. § 1997e(a) responsibilities (even if they might have excused some misstep in another case or at an earlier part of the grievance procedure). And the facts forwarded by the defendants here suggest that they feel justified in bending the policy when it suits the interest of the prison personnel.  In the § 1997e(a) inquiry it makes no difference whether ultimately the prison would or would not even consider giving relief. (I am skeptical that had Ouellette and the prison personnel joined issue at stage two and stage three of the prison's grievance procedure that any relief apropos the protective custody conditions would have been forthcoming.)  It is beyond me why defendants in such a position need to use § 1997e(a) as a sword rather than a shield.

[3]   Section 1997e(a) of title 42 obviously provides no guidance on the question of how long an inmate must wait for his grievance to be processed through the grievance procedure and exhausted.  Ouellette was obviously anxious to proceed with his legal remedies and meant to hold the prison personnel to their time-frame under the policy.

could uncover that discusses the level of onus a court can place on correctional defendants apropos fulfilling their obligations under a grievance procedure in a timely manner and in a fashion that makes it evident to the inmate where they stand in the grievance process.  This record does not support an inference that the defendants intentionally thwarted Ouellette's attempts to fulfill his 42 U.S.C. § 1997e(a) grievance obligations, but it is not clear to me that a plaintiff in Ouellette's shoes would need to demonstrate an intentional obstruction.  See Giano v. Goord, 380 F.3d 670, 675 (2d Cir. 2004) (observing that failure to exhaust is an affirmative defense, that a defendant's action may estop the States from asserting non-exhaustion as an affirmative defense, and that "in some circumstances the behavior of the defendants may render administrative remedies unavailable, for purposes of the PLRA").

I conclude that the defendants are not entitled to summary judgment. Ouellette knew what the grievance procedure was, he filed a stage one grievance in the hopes of complying with his 42 U.S.C. § 1997e(a) responsibilities and even took the extra step of writing the August 25 letter to Costigan. Through no fault of his own, at the time he filed this action Ouellette had no further administrative remedies available to him.  The defendants suggest that Ouellette could have tried to file a second-stage appeal after receiving the responses to the July 25 letters.  However, in Parker v. Robinson, Civ. No. 04-214-B-W (see Civ. No. 04-214-B-W, Docket No. 47) the Prison argued that inmate Parker's letter to the Commissioner that was sent directly to his office rather than submitting his third stage grievance to the grievance review officer did not conform to the grievance procedure and that, therefore, Parker had not fully exhausted his Eighth Amendment claim.[4]   These inconsistent arguments

---

4     I have issued an order to stay Parker's action  In that order I noted that the United States Supreme Court granted review apropos the Ninth Circuit's Ngo v. Woodford, 403 F.3d 620 (2005), 126 S. Ct. 647 on the question: "Does a prisoner satisfy the Prisoner Litigation Reform Act's administrative exhaustion requirement by filing an untimely or otherwise procedurally defective administrative appeal?" (Supreme Court Docket No. 05-416)(emphasis

in the most recent disputes over 42 U.S.C. § 1997e(a) exhaustion apropos the Maine State Prison to come before me give me pause; the familiar idiom applies, the Prison ate its cake in Parker and cannot have it back to savor now.[5]  Given that the spirit of § 1997e(a) is to allow the correctional institution an opportunity to address allegations of civil rights abuses, if the defendants wish to file a motion to stay this action to allow the parties to funnel Ouellette's grievance through the second and third stages of the grievance procedure, such a request would deserve consideration.[6]

*Conclusion*

For the reasons stated above, I recommend that the Court **DENY** the defendants' motion for summary judgment.[7]

---

added).  My conclusion that it was not Ouellette who can be faulted for any un-timeliness or procedural defect means that Ngo is inapplicable to this action; should the Court reject this recommendation it should consider whether or not a similar stay is warranted in this action.

[5]     I note that the Prison was represented by a different Assistant Attorney General in Parker and stress that the contradictory positions may well not have been intended.  My hope is that the resolution of these exhaustion disputes will set some parameters concerning both the Prison personnel and the inmate's responsibility under the Maine State Prison's grievance procedure that can make future § 1997e(a) disputes easier to navigate.

[6]     As to Ouellette's claim pertaining to due process in the grievance process, the defendants have not argued that the due process claim – as distinct from the conditions of confinement plaint- has not been exhausted. In the interest of efficiency I flag this issue for both sides.

[7]     If this Court concluded that Ouellette did not exhaust his available remedies, as a plaintiff alleging a continuing violation of his Constitutional rights, he could most likely go back, start afresh, and take his disparate treatment claim through all three levels of the grievance process. He could then file a new lawsuit in this court.  I note that this cumbersome process does little to improve efficiency for the court or the defendants, as it simply means that service of process will have to be recommenced and the court will only then get to the merits, or lack thereof, of this prisoner's lawsuit.  Exhaustion disputes are more troubling when the plaintiff is seeking redress for a one-time violation of his Constitutional rights, such as the Eighth Amendment claim at issue in Parker.

## *NOTICE*

  A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

  Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

January 23, 2006.

              /s/ Margaret J. Kravchuk
              U.S. Magistrate Judge